O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WILLISTINE GAYMON, | ) | Case No. EDCV 14-1369-KK |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND ORDER |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Willistine Gaymon, proceeding *pro se*, seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Agency") denying her applications for Title II disability insurance benefits ("DIB") and Title XVI supplemental security income ("SSI"). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the Commissioner's decision is AFFIRMED.

## I.

## PROCEDURAL BACKGROUND

On June 24, 2010, Plaintiff filed applications for DIB and SSI. Administrative Record ("AR") at 315, 318. The applications were denied initially on September 3, 2010,

1

1  and upon reconsideration on November 23, 2010.  Id. at 114-15.

2          On December 9, 2010, Plaintiff requested a hearing before an Administrative Law

3  Judge ("ALJ").  Id. at 169.  On January 26, 2012, a hearing was held, before ALJ Joseph

4  D. Schloss, at which Plaintiff was represented by counsel.  Id. at 89.  On February 3,

5  2012, ALJ Schloss issued a decision denying Plaintiff's applications.  Id. at 119.

6          Plaintiff asked the Agency's Appeals Council to review ALJ Schloss's decision.

7  Id. at 139.  On January 7, 2013, the Appeals Council remanded Plaintiff's case back to

8  ALJ Schloss to, inter alia, "obtain additional evidence concerning the claimant's

9  impairments," further "evaluate the claimant's mental impairments," and give "further

10  consideration to the claimant's" RFC.  Id. at 140.  ALJ Schloss recused himself.  Id. at 9.

11          On June 13, 2013, a hearing was held, before ALJ Tamara Turner-Jones, at which

12  Plaintiff was not represented by counsel.  Id. at 40.  On November 22, 2013, the ALJ

13  issued a decision denying Plaintiff's applications.[1]  Id. at 30.

14          On December 4, 2013, Plaintiff asked the Agency's Appeals Council to review the

15  ALJ's decision.  Id. at 4.  On March 24, 2014, the Appeals Council denied Plaintiff's

16  request for review.  Id. at 1.

17          On July 3, 2014, this action was removed to this Court from Riverside County

18  Superior Court.  ECF No. 1.  This matter is before the Court on the parties' respective

19  motions for summary judgment, which the Court has taken under submission without oral

20  argument.  See ECF Nos. 21, 25, 28.[2]

21  ///

22  ///

23  ///

24

25          [1] Unless otherwise stated, any references in this Order to "the ALJ" are to ALJ Turner-
26  Jones, not ALJ Schloss.

27          [2] The Court considers Plaintiff's Answer (ECF No. 25) to be part of her motion for
28  summary judgment.

2

1
2

## II.

## RELEVANT FACTUAL BACKGROUND

3   **A.    General Information**

4          Plaintiff was born on December 30, 1952, and her alleged disability onset date is

5   May 6, 2010.  AR at 295.  Plaintiff was 57 years old at the time of the alleged onset date,

6   and 60 years old at the time of the second ALJ hearing.

7          Plaintiff completed high school.  Id. at 48.  From June 1993 until January 2003,

8   Plaintiff worked as a senior computer programmer for a data processing business.  Id. at

9   346.  In 2003 or 2004, she obtained a certification as a substance abuse counselor.  Id. at

10  48.  From February 2004 to September 2006, she worked as a counselor at a treatment

11  facility for young males.  Id. at 346.  From May 2005 until May 6, 2010, Plaintiff worked

12  as the clinical director for a treatment facility for pregnant women with substance abuse

13  problems.  Id.

14         In her initial application for benefits, Plaintiff alleged disability based upon "major

15  depression recurrent, PTSD, anxiety, hypertension, bi-lateral carpel tunnel, [and] bi-

16  late[r]al tarsal tunnel."  Id. at 345 (numbering and paragraph breaks omitted).

17

18  **B.    Medical Evidence**

19         **1.    Dr. Baldev S. Rai**

20         On September 13, 2003, Plaintiff received a neurological evaluation by Dr. Baldev

21  S. Rai.  Id. at 746.  Dr. Rai found Plaintiff had "decreased sensation in the thumbs" and

22  that her "clinical presentation [was] suggestive of a bilateral carpal tunnel syndrome."  Id.

23  Plaintiff was "asked" to "start using wrist supports."  Id.

24         Dr. Rai also saw Plaintiff in March 2005, at which time she had "improved some

25  on the right side but not back to normal," with "more symptoms" on her left side.  Id. at

26  880.

27         Dr. Rai saw Plaintiff again on July 2, 2010, at which time she "complain[ed] of

28  bilateral hand numbness as well as aching of bilateral hands and also complained of

1  swelling in the hands and arms on both sides." Id.

2  On August 2, 2010, Plaintiff "had a repeat nerve conduction study," which "again

3  showed mild left worse than right carpal tunnel syndrome." Id.

4  On October 7, 2010, Plaintiff complained to Dr. Rai of "pain in both index fingers

5  and pins and needles feelings in second third and fourth fingers bilaterally." Id. Dr. Rai

6  said Plaintiff also complained of "problems grasping things" and pain "in the wrists on

7  both sides." Id. Dr. Rai stated he had a "detailed discussion" with Plaintiff and asked her

8  "to continue using over-the-counter anti-inflammatory medications as needed along with

9  wrist supports." Id. Dr. Rai said Plaintiff would "follow up in the future on an as-needed

10  basis." Id.

11  On July 14, 2011, Plaintiff visited Dr. Rai, complaining of "numbness and pain" in

12  her fingers and arms. Id. at 876. Dr. Rai found Plaintiff "continues to have symptoms

13  related to carpal tunnel syndrome." Id. at 877. He advised Plaintiff to "continue using

14  wrist supports" and to "followup on an as needed basis." Id.

15  On June 28, 2013, Plaintiff received a clinical assessment by Dr. Rai. Id. at 1128.

16  The assessment showed "continued problems with bilateral hands and upper extremities,"

17  but "a negative workup for rheumatoid arthritis." Id. Dr. Rai found Plaintiff "may have

18  some osteoarthritis in the hands." Id. Dr. Rai did not prescribe Plaintiff medication, but

19  advised her "to use nonsteroidal anti inflammatory pain medication on an as needed

20  basis." Id.

21

22  **2.    Kaiser Permanente**

23  Plaintiff visited Kaiser Permanente multiple times from January 26, 2010, until

24  July 8, 2010. Id. at 579, 611. On January 26, 2010, Plaintiff received a physical

25  examination, which showed she was well-nourished; had a normal heart rate; was not in

26  respiratory distress; was alert and oriented; had a normal gait; had a normal affect and

27  judgment; appeared alert and oriented; did not exhibit a depressed mood; and exhibited

28  ordered thought content.

4

1
2
3

After Plaintiff's visit on February 25, 2010, Dr. Irene Oladokun wrote that Plaintiff complained of anxiety; Plaintiff's anxiety started two months before; and Plaintiff's blood pressure was better than at her previous visit, due to oral medication. Id. at 624.

4
5
6
7
8

After Plaintiff's visit on April 12, 2010, Dr. Irene Oladokun wrote that Plaintiff's "anxiety and adjustment symptoms seem[ed] not well controlled." Id. at 610. Plaintiff reported "going through lots of work stress" and said she "now cries more frequently." Id. Plaintiff received medication refills of verapamil (for high blood pressure), sertraline (for depression), and alprazolam (for anxiety).[3] Id. at 613.

9
10
11
12
13

On May 27, 2010, Plaintiff complained of abdominal pain and received an abdominal ultrasound examination. Id. at 596. Dr. Alice Chan wrote that Plaintiff's examination was "satisfactory." Id. Dr. Chan found Plaintiff's liver, gallbladder, common bile duct, pancreas, aorta, kidneys, and spleen appeared to be "normal." Id. at 596-97.

14
15

On July 8, 2010, Dr. Oladokun wrote that Plaintiff's blood pressure seemed to be "well controlled" with oral medication. Id. at 579.

16

17

### 3.   Dr. Evan George Tzakis

18
19
20
21
22
23
24
25

On May 18, 2010, Plaintiff received a medical evaluation by Dr. Evan George Tzakis. Id. at 645. Dr. Tzakis wrote that Plaintiff presented with depression. Id. Dr. Tzakis wrote that Plaintiff told him she had been suffering from "job burn out"; she found her staff ineffective and the Board of Directors "not understanding"; she had post-traumatic stress disorder from a car accident; she did not plan to return to her job; she would like to collect SSI disability and work part time in a small private practice instead; she cared too much for her children; and she was depressed. Id. Plaintiff said her primary care physician had "started her on Zoloft 25mg daily about 3 months ago and

26

27
28

[3] Drug indications are obtained from the National Institutes of Health's MedlinePlus website (http://www.nlm.nih.gov/medlineplus/).

now up to 50mg daily." Id.

### 4.    Dr. Jeffrey Bone

On July 18, 2010, Plaintiff received a psychological and mental status examination by Dr. Jeffrey Bone, at the request of the State Compensation Insurance Fund. Id. at 651. According to Dr. Bone's report, Plaintiff related the following information:

- In February 2009, a co-worker complained about Plaintiff to the director of Plaintiff's place of employment (the YWCA). Id. at 653. Around this time, Plaintiff began experiencing crying spells while driving to work because the staff had become hostile towards her and would frequently refuse to talk to her. Id.

- Around June or July 2009, Plaintiff "led the relocation of her facility" without proper assistance from the YWCA organization. Id. at 654.

- In September 2009, Plaintiff attended a training workshop at the Betty Ford Center. Id. In November 2009, Plaintiff was accused of attending the workshop without the consent of her supervisor, and of changing her hours without informing the supervisor. Id.

- In November 2009, Plaintiff received a negative written performance review, which she considered unfair. Id. Shortly thereafter, Plaintiff "emailed the human resource director . . . and asked if she qualified for disability due to stress." Id. Plaintiff was contacted by a former member of the Board of Directors and told that stress was part of Plaintiff's job and could not be avoided. Id. at 655.

- On December 19, 2009, Plaintiff was in a car accident. Id. Plaintiff believed she was going to die during the accident and experienced a panic attack shortly after it happened. Id. Plaintiff was taken to the emergency room and provided medication "due to her elevated heart rate and blood pressure." Id. Plaintiff was released from the hospital later the same day.

6

1    Id.

2    -    In January or February of 2010, Plaintiff was prescribed Zoloft and Xanax

3         by a physician at Kaiser Permanente.  Id.

4    -    On March 20, 2010, Plaintiff wrote a letter to her supervisor, complaining of

5         emotional burnout, false accusations by YWCA staff, and that the car

6         accident on December 19, 2009, had exacerbated her workplace stress.  Id.

7    -    Plaintiff "was put on disability by a physician through Kaiser on May 6,

8         2010," but she "continued to work her usual and customary duties for the

9         next four days, because she was unable to find anyone to cover her

10        position."  Id.

11   -    On June 9, 2010, Plaintiff returned to work at the YWCA, but was written

12        up by a supervisor for failing to properly document the termination of

13        another employee.  Id. at 656.

14   -    On June 18, 2010, Plaintiff was informed the staff would no longer report to

15        her.  Id.  Shortly thereafter, Plaintiff filed a workers' compensation claim.

16        Id.

17   -    Plaintiff attributed 50 percent of her emotional distress to the car accident

18        and 50 percent to work stress.  Id.

19        Dr. Bone found Plaintiff to be "experiencing clinically significant anxiety and

20   depression."  Id. at 666.  Dr. Bone administered two psychological tests, both of which

21   raised concerns of "non-credible" "over-reporting" by Plaintiff "of somatic and/or

22   cognitive symptoms."  Id. at 662, 664-65.  Dr. Bone opined that Plaintiff "would benefit

23   from a brief course of psychotherapy to alleviate her current symptoms of depression and

24   anxiety."  Id. at 667.

25

26        **5.    Dr. Terrance P. Flanagan**

27        On August 11, 2010, Plaintiff received a complete orthopedic evaluation by Dr.

28   Terrance P. Flanagan.  Id. at 694.  Dr. Flanagan found Plaintiff sat and stood with normal

7

posture; had a normal gait; could ambulate without an assistive device; could get on and off the examining table without difficulty; had a full range of motion in her neck and back; had a normal range of motion in her shoulders, elbows, wrists, hands, hips, knees, and ankles; had motor strength that was grossly within normal limits, with some exceptions; had neck pain; and did not appear to have ongoing carpal tunnel syndrome or tarsal tunnel syndrome. Id. at 696-98. Based upon the examination, Dr. Flanagan found "no specific limitations [were] indicated." Id. at 698.

### 6.   Dr. Andro N. Sharobiem

From September 2, 2010, until February 20, 2013, Plaintiff was treated by Dr. Andro N. Sharobiem. Id. at 955, 1121. On April 18, 2011, Plaintiff was noted to be "well developed and well nourished," with no shortness of breath, chest pain, or heart palpitations. Id. at 892. However, Plaintiff complained of memory loss and of difficulty concentrating and focusing. Id.

On May 1, 2011, Dr. Sharobiem completed a medical source statement form given to him by Plaintiff's lawyer at the time. Id. at 870. Using a checklist, Dr. Sharobiem stated Plaintiff had the lowest physical abilities possible – that she could not lift more than ten pounds, and could only sit, stand, or walk for less than two hours in an eight-hour day (with normal breaks). Id. Using another checklist, Dr. Sharobiem stated Plaintiff was the most environmentally restricted possible – that she should "avoid all exposure" to extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and other hazards. Id. at 872. Using another checklist, Dr. Sharobiem stated Plaintiff could occasionally twist and crouch, but could never bend, climb stairs, or climb ladders. Id. at 871. Using another checklist, Dr. Sharobiem stated Plaintiff's impairments affected her ability to reach, handle, finger, feel, push, and pull. Id. Dr. Sharobiem wrote that Plaintiff would need to lie down "any time" she "suffer[ed] from stress [or] anxiety." Id. In response to the question, "What medical findings support the limitations described above?," Dr. Sharobiem wrote: "Flashbacks, panic

8

attacks, dizziness, lightheadedness, heart palpitations, back pain." Id.

On August 31, 2011, Dr. Sharobiem performed a physical examination of Plaintiff, and found "no respiratory distress"; normal heart rate; normal gait; normal movements of all extremities; no joint instability; and normal muscle strength and tone. Id. at 888.

In an undated letter from some time after July 30, 2012, and addressed "to whom it may concern," Dr. Sharobiem wrote: "Since [September 2, 2010] I have observed Ms. Gaymon's health decline especially when stressed. I've had to add a second Blood Pressure medication to get her BP controlled in July 2011. I've witnessed Ms. Gaymon's face distorted during the time she was trying to settle with her own insurance company for the accident in which she was sideswiped." Id. at 955. After briefly reviewing Plaintiff's complaints and medication, Dr. Sharobiem wrote: "In my professional opinion as her primary physician her condition is worsening and I don't see anywhere in the near future that all of her diagnosis [sic] are going to get better especially with her doing the best she can with her limited funds for treatment." Id.

After a routine physical examination on November 20, 2012, Dr. Sharobiem found Plaintiff to be suffering from a variety of problems, including anxiety, asthma, carpal tunnel syndrome, chronic recurrent major depressive disorder, chronic constipation, irritable bowel syndrome, posttraumatic stress disorder, uncontrolled hypertension, and fibromyalgia. Id. at 957-58.

On February 20, 2013, Dr. Sharobiem informed Plaintiff, by letter, that he would no longer able to provide her with medical care, explaining that "[o]ur office does not tolerate verbal abuse." Id. at 1121.

### 7.    Loma Linda University Medical Center

On March 21, 2011, Plaintiff went to the emergency department at Loma Linda University Medical Center, complaining of chest pain, shortness of breath, and dizziness. Id. at 773. After a physical examination, Plaintiff was found to be generally alert, to have a regular heart hate, and to have non-labored respiration. Id. at 775. Plaintiff was

released later the same day and told to follow up with her primary care physician in a week.  Id. at 777.

### 8.    Dr. Arnold Purisch

On June 6, 2011, Plaintiff received a psychological evaluation by Dr. Arnold Purisch, at the request of 21st Century Insurance.  Id. at 807.  Dr. Purisch administered a battery of psychological tests to Plaintiff, and found that "[m]ost" of them "challenge[d] the credibility of her reports of symptoms and disability."  Id. at 865.  Dr. Purisch noted, for example, that Plaintiff's "responses to the Beck Anxiety Inventory indicated an extreme amount of anxiety, well beyond expectations given her clinical presentation and more severe than patients diagnosed with various types of anxiety spectrum disorders."  Id.  Dr. Purisch ultimately reached the following conclusion:

> These excessive complaints and indications of questionable credibility on measures of motivation and effort raise the potential that some of [Plaintiff's] problems may be grossly exaggerated or feigned motivated by external incentives (i.e., malingering).  Indeed, there are various potential sources of secondary gain, including the fact that she is experiencing financial distress . . . .  On the other hand, her exaggerated and magnified complaints could also represent a "cry for help" in which symptoms are well beyond expectations because of the need to procure attention, support and treatment rather than obvious external secondary gain.  Regardless, whether her complaints are a manifestation of malingering and/or a "cry for help," it is quite likely that she is capable of functioning at a higher level than she claims.

Id. at 866.

Dr. Purisch also found "the significance of the motor vehicle accident" in Plaintiff's mental deterioration "questionable."  Id. at 867.  Dr. Purisch stated:  "It is difficult to conceive of how a relatively minor motor vehicle accident could have

10

triggered a full blown Posttraumatic Stress Disorder, especially one in which the symptoms began to slowly evolve over time." Id.

After Dr. Purisch issued his report, Plaintiff threatened to file an ethics complaint against him for "calling me a liar." Id. at 915. Dr. Purisch denied calling Plaintiff a liar. Id. at 916.

### 9.    Dr. Bahaa Girgis

On March 20, 2013, Plaintiff received an internal medicine evaluation by Dr. Bahaa Girgis, at the request of the California Department of Social Services. Id. at 976. After physically examining Plaintiff, Dr. Girgis found Plaintiff walked and moved easily; responded quickly to questions; was well-developed and well-nourished; had grossly normal movement in all of her extremities, including her wrists; did not require an assistive aid to ambulate or get on and off the examining table; had "well controlled" hypertension on her medication; had COPD due to secondhand smoke; had a history of reactive airway disease; and had chronic back pain, "likely due to muscle strain." Id. at 976-80.  Based on the examination, Dr. Girgis found Plaintiff was "capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently"; was capable of standing, walking, and sitting six hours in an eight-hour workday; and had no postural, manipulative, visual, communicative, or environmental limitations. Id. at 981.

### 10.    Dr. Vicente R. Bernabe

On March 25, 2013, Plaintiff received an orthopedic consultation by Dr. Vicente R. Bernabe, at the request of the California Department of Social Services. Id. at 990.  After physically examining Plaintiff, Dr. Bernabe found Plaintiff capable of lifting, carrying, pushing, pulling, and performing grossly manipulative activities without restriction, and capable of performing fine manipulative activities on a frequent basis. Id. at 994.

### 11.    Dr. Kara Cross

On April 14, 2013, Plaintiff received a complete mental evaluation by Dr. Kara Cross, at the request of the California Department of Social Services. Id. at 1020. Plaintiff drove herself to the appointment, though she did not have a driver's license. Id. Plaintiff stated she saw a psychiatrist for four months in 2011. Id. at 1021. Plaintiff stated she lives by herself; can take care of self-dressing, self-bathing, and personal hygiene; can drive a car; goes to the gym and takes very short walks; is able to pay bills and handle cash appropriately; is able to go out alone; has good relationships with family and friends, but bad relationships with others; can focus attention; has some difficulty completing household tasks; has no difficulty making decisions; goes on the computer and uses the internet; can use a smartphone; and needs help with household chores. Id. at 1022.

Dr. Cross found Plaintiff "neatly and casually groomed." Id. Dr. Cross found no evidence of exaggeration or manipulation. Id. at 1023. Dr. Cross stated Plaintiff "did not appear to be under too much medication." Id. Dr. Cross stated Plaintiff's behavior in the waiting room was consistent with behavior in the testing office. Id. Dr. Cross found Plaintiff "coherent and organized," with a depressed mood and "slightly anxious" demeanor. Id. Dr. Cross found Plaintiff's speech normal and "clearly articulated," and Plaintiff's judgment to be "intact." Id. at 1023-24.

Based on her examination, Dr. Cross found Plaintiff (1) able to understand, remember, and carry out simple one or two-step job instructions; (2) able "to do detailed and complex instructions"; (3) moderately impaired at relating and interacting with co-workers and the public "because of her feelings of victimization"; (4) mildly impaired at maintaining "concentration and attention, persistence and pace"; (5) able to associate with day-to-day work activity, including attendance and safety; (6) moderately impaired at accepting instructions from supervisors "because of her feelings of victimization"; (7) moderately impaired at maintaining regular attendance in the work place and performing

1  work activities on a consistent basis, due to "somatization disorder";[4] (8) able to perform

2  work activities without special or additional supervision; and (9) was not a danger in the

3  work setting.  Id. at 1024-25.

4

5  **C.   Written Statements by Plaintiff and Lay Witnesses**

6       In a Function Report dated August 6, 2010, Plaintiff stated she lived alone; she

7  followed instructions poorly; she experienced paranoia; and she had difficulty walking

8  for more than 30 minutes due to asthma.  Id. at 366, 369-72.  Plaintiff also stated in the

9  Function Report that she could water her yard, prepare simple meals, do laundry, and

10 shop in stores for groceries.  Id. at 20.  The Administrative Record also contains multiple

11 letters from Plaintiff to the ALJs and to others.  See id. at 421-23, 436-58, 565-78.  Most

12 of Plaintiff's letters detail her health problems, grievances about getting fired from her

13 previous job, and grievances about the disability adjudication process.  See id.  In

14 Plaintiff's most recent letter, to ALJ Turner-Jones on August 28, 2013, she stated she

15 "just returned from visiting" her children and grandchildren "in NJ and NY."  Id. at 569.

16 Plaintiff wrote it was "a difficult trip because I can no longer sleep on the plane due to

17 problems with my neck, collarbone, feet, back and knees."  Id.  Plaintiff wrote that, while

18 she was at her "oldest daughter's house," she had "difficulty breathing" and "chest pains"

19 because of smoke from frying chicken.  Id.  Plaintiff wrote that, at her son's house, "his

20 girlfriend made smoked turkey bacon and that was a real big problem for me."  Id.

21 Plaintiff wrote:  "I thought I had a cold after returning home but I'm sure that I have

22 Bronchitis I coughed so hard I pulled a muscle in my neck."  Id.  Plaintiff wrote that she

23 declined to take arthritis medication prescribed by her doctor because its side effects

24  _____

25      [4] "Somatization disorder is a long-term (chronic) condition in which a person has

26 physical symptoms that involve more than one part of the body, but no physical cause can

27 be found. . . .  People with this disorder have many physical complaints that last for
   years."  National Institutes of Health, Somatization Disorder:  MedlinePlus Medical

28 Encyclopedia, http://http://www.nlm.nih.gov/medlineplus/ency/article/000955.htm.

include a risk of heart attack, so instead she was taking turmeric.  Id.  Plaintiff wrote:  "I don't believe in pain medications I've never experienced any of them helping me.  They just make me feel weird so I just deal with it."  Id.

Plaintiff also submitted multiple letters from friends and family stating they observed her having mood swings, depression, anxiety, shortness of breath, and other symptoms, especially since her car accident in December 2009.  See id. at 412-20.

**D.    ALJ Hearing**

**1.    Plaintiff's Testimony**

At the hearing before ALJ Turner-Jones, Plaintiff explained that her lawyer at the previous hearing withdrew from representation, and that she "chose to" proceed without a lawyer rather than find a new one.  Id. at 44.

Plaintiff testified she drives "maybe a total of an hour" per week.  Id. at 46.  Plaintiff stated she lives alone.  Id. at 47.  Plaintiff stated she "can sleep two to three days at a time," and naps "anywhere from two to seven hours, or right through the next day."  Id.

Plaintiff stated she worked at a YWCA until May 6, 2010, her alleged onset date, when she "was terminated because [she] was on disability too long."  Id. at 50.  Plaintiff testified:  "They were trying to force me out anyway so that was just an opportunity for them.  I was harassed there a lot."  Id.  Plaintiff stated "[t]hey were trying to get me to do illegal things."  Id.

Plaintiff stated she "can no longer do [her] own hair" due to rheumatoid arthritis.  Id. at 55.  Plaintiff testified she uses a computer to go on Facebook, check emails, and type letters.  Id. at 58.  Plaintiff testified that, in 2010, she began to suffer from depression and anxiety, and was eventually prescribed 200 milligrams of Zoloft.  Id. at 63.  Plaintiff testified that after "thousands of tests," doctors "told me that I was crazy."  Id. at 64.  Plaintiff testified she has "had anxiety and depression all of [her] life," since she was raped at nine years old.  Id. at 68.

14

Plaintiff testified her "last doctor" told her "he wouldn't provide me services because I was verbally abusive." Id. at 82. Plaintiff stated she "ha[s] rage." Id. Plaintiff later stated: "There's a lot of times that I can go to a doctor's appointment and I don't tell them everything that is wrong because I just don't remember." Id. at 85. Plaintiff stated she had chronic obstructive pulmonary disease (COPD), and described it as "a terminal disease." Id. at 86. Plaintiff said she will "have a flare up" if someone around her "wear[s] perfume" or "is barbequing outside," or if "I'm driving in my car with my windows down and someone's hanging a cigarette out of the car." Id.

### 2.    Lay Witness Testimony

Plaintiff's friend, Beatrice Braswell, also testified at the hearing. Id. at 69. Ms. Braswell testified she had known Plaintiff "for over 17 years." Id. at 69. Ms. Braswell testified she knew Plaintiff "to be a very active person," and to have "never worked less than three jobs . . . as long as I've known her." Id. at 70. Ms. Braswell continued: "But lately with all of the issues that she's experiencing she some days can barely get out of bed." Id. The ALJ asked Ms. Braswell when she last saw Plaintiff; Ms. Braswell replied she last saw Plaintiff in September of 2012. Id. Ms. Braswell testified Plaintiff recently seemed "depressed," "erratic," and like "she startles real easily." Id. at 71-72.

### 3.    Vocational Expert's Testimony

A vocational expert (VE) also testified at the hearing, after listening to Plaintiff's testimony and reviewing her vocational background. Id. at 29. The ALJ asked the VE whether a hypothetical person could perform Plaintiff's past relevant work, if that person had Plaintiff's age, education, work experience, and RFC (as determined by the ALJ). Id. The VE testified that such a person would be able to perform Plaintiff's past relevant work. Id.; see also AR at 75-84.

### III.

15

## STANDARD FOR EVALUATING DISABILITY

In order to qualify for DIB or SSI, a claimant must demonstrate a medically determinable physical or mental impairment that (1) prevents her from engaging in substantial gainful activity and (2) is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.[5]

(3) Does the claimant's impairment meet or equal one of the specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments")? If so, the claimant is found disabled. If not, proceed to step

---

[5] In evaluating whether a mental impairment is severe, the ALJ must rate the degree of functional loss resulting from the impairment, in four areas, collectively known as "paragraph B" criteria: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); see also Maier v. Comm'r of Soc. Sec. Admin., 154 F.3d 913, 914-15 (9th Cir. 1998). The Agency's regulations state: "If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

1       four.[6]

2           (4)    Is the claimant capable of performing work she has done in the past?  If so,
3                  the claimant is found not disabled.  If not, proceed to step five.

4           (5)    Is the claimant able to do any other work?  If not, the claimant is found
5                  disabled.  If so, the claimant is found not disabled.

6  Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54
7  (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

8           The claimant has the burden of proof at steps one through four, and the
9  Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54.
10  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the
11  record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her
12  burden of establishing an inability to perform past work, the Commissioner must show
13  that the claimant can perform some other work that exists in "significant numbers" in the
14  national economy, taking into account the claimant's residual functional capacity
15  ("RFC"), age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100;
16  Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

17

18                                      **IV.**

19                            **THE ALJ'S DECISION**

20  **A.    Step One**

21          At step one, the ALJ found Plaintiff "has not engaged in substantial gainful activity
22  since May 6, 2010, the alleged onset date."  AR at 12 (citation omitted).

23  ―――――――――――

24      [6] "Between steps three and four, the ALJ must, as an intermediate step, assess the
25  claimant's [residual functional capacity]."  Bray v. Comm'r of Soc. Sec. Admin., 554
    F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)).  In determining a
26  claimant's residual functional capacity, an ALJ must consider all relevant evidence in the
27  record.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).  This involves,
    inter alia, evaluating the credibility of a claimant's testimony regarding her capabilities.
28  Chaudhry v. Astrue, 688 F.3d 661, 670 (9th Cir. 2012).

                                        17

**B.      Step Two**

At step two, the ALJ found Plaintiff "has the following severe impairments: lumbago; cervical myofascial strain; mild bilateral carpal tunnel syndrome, status post right carpal tunnel release surgery; tarsal tunnel syndrome; ulnar neuropathy of the bilateral elbows; peripheral neuropathy of the bilateral feet; chronic obstructive pulmonary disease (COPD); fissuring of the left heel; history of irritable bowel syndrome (IBS); history of first-degree AV block; history of anxiety disorder and posttraumatic stress disorder (PTSD); somatization disorder; and dysthymia." Id. (citations omitted).

**C.      Step Three**

At step three, the ALJ found Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Id. at 14 (citations omitted).

**D.      RFC Determination**

The ALJ found Plaintiff has the RFC "to perform medium work . . . , specifically as follows:  the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently; she can stand and/or walk for six hours out of an eight-hour workday with customary breaks; she can sit for six hours out of an eight-hour workday with customary breaks; she can frequently kneel, stoop, crawl, or crouch; she can frequently climb ramps or stairs; she can occasionally climb ladders, ropes and scaffolds; the claimant can frequently use the upper extremities for fine and gross manipulations; she can frequently reach overhead with the upper extremities bilaterally; she needs to avoid concentrated exposure to unprotected heights and dangerous moving machinery; she must also avoid concentrated exposure to extremely cold temperatures and pulmonary irritants such as dusts, fumes, gases, and odors; the claimant can sustain concentration, attention, persistence and pace in at least two-hour blocks of time; the claimant can understand and

18

carry out both detailed and complex tasks; however, due to a low tolerance for stress, the claimant requires a work environment not involving fast-paced production requirements or assembly-line work; she can interact appropriately with coworkers and supervisors, but will need only casual and non-intense interactions with the general public; and the claimant will be off-task for five percent of a workday." Id. at 15-16.

**E.    Step Four**

At step four, the ALJ found Plaintiff "is capable of performing past relevant work as a casework supervisor, children's institute attendant, and computer programmer." Id. at 29.

**F.    Step Five**

The ALJ did not analyze step five.

**V.**

**PLAINTIFF'S CLAIMS**

Plaintiff appears to raise nine claims:[7]

1.    The ALJ gave "insufficient weight" to "the treating physician's opinion."

2.    The VE's "testimony [was] not based on correct RFC."

3.    Plaintiff's fibromyalgia was "erroneously classified as 'non-severe.'"

4.    The ALJ did not "consider both severe and non-severe impairments."

5.    The ALJ failed to "give specific reasons for not finding" Plaintiff believable.

6.    The ALJ "left out important information" in discussing Plaintiff's testimony.

7.    The ALJ improperly failed "to consider the type, dosage, effectiveness, and side effects of all of" Plaintiff's medications.

---

[7] The Court has done its best to understand Plaintiff's arguments, which are frequently unclear.

8.      The ALJ improperly "discounted observations of non-physician medical professionals."

9.      The ALJ "did not develop [the] medical record."

ECF No. 25 at 3-5.  The Court will address each of these claims, though in different order, for the sake of clarity.

## VI.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  This Court "may set aside a denial of benefits if it is not supported by substantial evidence or it is based on legal error." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citation and internal quotation marks omitted).

"Substantial evidence" is evidence a reasonable person might accept as adequate to support a conclusion. Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance. Id.  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (stating a reviewing court "may not affirm simply by isolating a specific quantum of supporting evidence") (citations and internal quotation marks omitted).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Reddick, 157 F.3d at 720-21; see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").     The Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).  If the ALJ

20

1  erred, the error may only be considered harmless if it is "clear from the record" that the

2  error was "inconsequential to the ultimate nondisability determination." <u>Robbins</u>, 466

3  F.3d at 885 (citation and internal quotation marks omitted).

4

5  **VII.**

6  **DISCUSSION**

7  **A.   The ALJ Did Not Fail to Develop the Medical Record.  (Claim Nine)**

8  Plaintiff argues the ALJ improperly failed to "develop [the] medical record."  ECF

9  No. 25 at 5.  Specifically, Plaintiff argues that not "[a]ll" of her records were reviewed by

10  the ALJ.  <u>Id.</u>

11

12  **1.   Background**

13  At the hearing, the ALJ stated she was "leaving the record open for 30 days to

14  allow" Plaintiff to submit "additional documents to me."  AR at 86.  The ALJ stated:  "I

15  want to make sure that I have everything that you have out there before I make the

16  decision."  <u>Id.</u>  After the hearing, Plaintiff submitted additional documents – including

17  letters, photographs, and medical records – which are part of the Administrative Record.

18  <u>See, e.g.</u>, <u>id.</u> at 273-91, 560-78, 1121-48.

19

20  **2.   Relevant Law**

21  "The ALJ always has a special duty to fully and fairly develop the record and to

22  assure that the claimant's interests are considered."  <u>Celaya v. Halter</u>, 332 F.3d 1177,

23  1183 (9th Cir. 2003) (citation and internal quotation marks omitted).  "[I]t is incumbent

24  upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for

25  all the relevant facts."  <u>Id.</u> (citation and internal quotation marks omitted).

26  "[A]n ALJ's duty to develop the record further is triggered only when there is

27  ambiguous evidence or when the record is inadequate to allow for proper evaluation of

28  the evidence."  <u>McLeod v. Astrue</u>, 640 F.3d 881, 885 (9th Cir. 2010) (footnote and

1   internal quotation marks omitted); <u>see also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958 (9th

2   Cir. 2002) ("[T]he requirement for additional information is triggered only when the

3   evidence from the treating medical source is inadequate to make a determination as to the

4   claimant's disability.").  "The ALJ may discharge this duty in several ways, including

5   subpoenaing the claimant's physicians, submitting questions to the claimant's physicians,

6   continuing the hearing, or keeping the record open after the hearing to allow

7   supplementation of the record."  <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir.

8   2001) (citations omitted).

9

10          **3.     Application**

11          Plaintiff does not clearly explain what records – that are not already part of the

12   lengthy Administrative Record – the ALJ should have obtained, or how such records

13   might have clarified an ambiguity or cured an inadequacy in the Administrative Record.

14   <u>See</u> <u>McLeod</u>, 640 F.3d at 885.  In any case, the ALJ kept "the record open after the

15   hearing to allow supplementation of the record," thus satisfying her duty to develop it.

16   <u>Tonapetyan</u>, 242 F.3d at 1150.  Therefore, Plaintiff has not shown the ALJ failed to

17   properly develop the record.

18

19   **B.     The Court Will Not Consider the New Evidence Plaintiff Has Submitted.**

20          Plaintiff has submitted exhibits and "supplemental documents" for the Court's

21   consideration.  <u>See</u> ECF No. 25 at 30-111; ECF Nos. 29, 30.  At least some of the

22   exhibits and supplemental documents are not in the Administrative Record, since they are

23   too recent for the Agency to have considered them.  The Court may not consider evidence

24   that is not part of the Administrative Record.  <u>See</u> <u>Brewes v. Comm'r of Soc. Sec.</u>

25   <u>Admin.</u>, 682 F.3d 1157, 1160 (9th Cir. 2012).  The Court may remand for the

26   consideration of new evidence, but only if (1) the new evidence "bear[s] directly and

27   substantially on the matter in dispute," and (2) the claimant "demonstrate[s] that the new

28   evidence was unavailable earlier."  <u>Mayes v. Massanari</u>, 276 F.3d 453, 462-63 (9th Cir.

22

2001) (citations and internal quotation marks omitted).  Here, Plaintiff has not demonstrated either prong of this test.  Thus, the Court will not remand for consideration of the new evidence.

## C.   The ALJ Gave Sufficient Reasons for Rejecting Dr. Sharobiem's Medical Source Statement.  (Claim One)

Plaintiff argues the ALJ gave "insufficient weight" to "the treating physician's opinion."  ECF No. 25 at 3.

### 1.   Background

In assessing Plaintiff's RFC, the ALJ reviewed and considered her medical history.  AR at 21.  In the course of that review, the ALJ found "Dr. Sharobiem's medical source statement to be unpersuasive in light of the objective record as a whole," and did not accord the statement "any significant weight in the decision-making process."  Id. at 25; see also supra Section II.B.6 (summarizing Dr. Sharobiem's medical source statement).  In support of that finding, the ALJ wrote:

> This checklist-style form appears to have been completed as an accommodation to the claimant and includes only conclusions regarding functional limitations without any real rationale for these conclusions.  Dr. Sharobiem's treatment notes show that he treated the claimant mainly for physical symptoms, and his notes documented rather unremarkable physical findings. . . .  Furthermore, the undersigned notes that rather than explaining the medical findings to support the severely restrictive environmental limitations he assessed, Dr. Sharobiem appeared to have only listed the claimant's symptoms and diagnoses without providing any meaningful commentary. . . . [T]here were very limited mental status examinations, if any, documented in [Dr. Sharobiem's] record to support the psychiatric

23

1  limitations he noted on the form.  The doctor's opinion regarding the
2  claimant's mental state appears to rest at least in part on an assessment
3  of an impairment outside the doctor's area of expertise.
4  AR at 25.

6  ## 2.    Relevant Law

7  An ALJ "must consider all medical opinion evidence," and is responsible for
8  "resolving conflicts in medical testimony." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041
9  (9th Cir. 2008); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  Where a
10  treating or examining doctor's opinion is not contradicted by another doctor, "it may be
11  rejected only for clear and convincing reasons supported by substantial evidence in the
12  record." <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007) (citation and internal quotation
13  marks omitted).  However, where a treating or examining doctor's opinion is
14  contradicted, the ALJ may reject the opinion if he provides "specific and legitimate
15  reasons supported by substantial evidence in the record." <u>Id.</u> (citations and internal
16  quotation marks omitted).  "This can be done by setting out a detailed and thorough
17  summary of the facts and conflicting clinical evidence, stating his interpretation thereof,
18  and making findings." <u>Id.</u> (citation and internal quotation marks omitted).

20  ## 3.    Application

21  The ALJ provided "specific and legitimate reasons supported by substantial
22  evidence" for rejecting Dr. Sharobiem's medical source statement that Plaintiff was
23  severely limited both physically and mentally.  <u>Orn</u>, 495 F.3d at 632.  The ALJ rejected
24  the statement because it (1) was largely in the form of a checklist; (2) provided little or no
25  rationale for its conclusions regarding functional and environmental limitations; (3) was
26  not supported by objective physical findings; and (4) contained mental health opinions
27  that appeared to be outside Dr. Sharobiem's area of expertise.  AR at 25.  Each of these
28  reasons was specific, legitimate, and supported by substantial evidence.  <u>See, e.g.,</u>

24

1    Molina, 674 F.3d at 1111 ("[T]he ALJ may permissibly reject check-off reports that do
2    not contain any explanation of the bases of their conclusions.") (citations, internal
3    quotation marks, and alterations omitted); Batson v. Comm'r of Soc. Sec. Admin., 359
4    F.3d 1190, 1195 (9th Cir. 2004) (holding an ALJ did not err in discounting a treating
5    physician's opinion, where "it was in the form of a checklist, did not have supportive
6    objective evidence, [and] was contradicted by other statements and assessments");
7    Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) (noting an ALJ should consider a
8    doctor's specialization in deciding how much weight to assign the doctor's opinion).
9
10   **D.    The ALJ Did Not Mischaracterize Plaintiff's Testimony.  (Claim Six)**
11       Plaintiff argues the ALJ "left out important information" when discussing her
12   testimony.  ECF No. 25 at 2.  However, Plaintiff does not specify what "important
13   information" the ALJ "left out."  Out of an abundance of caution, the Court has reviewed
14   Plaintiff's testimony and the ALJ's discussion of it.  Compare AR at 16-17 with id. at 40-
15   113.  The Court has determined the ALJ did not leave out important information or
16   otherwise mischaracterize the testimony.
17
18   **E.    The ALJ Gave Sufficient Reasons for Discounting Plaintiff's Credibility.**
19   **      (Claim Five)**
20       Plaintiff argues the ALJ did not "give specific reasons for not finding [her]
21   believable."  ECF No. 25 at 2.
22
23       **1.    Background**
24       In assessing Plaintiff's RFC, the ALJ found Plaintiff's "medically determinable
25   impairments could reasonably be expected to cause the alleged symptoms."  AR at 20.
26   However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and
27   limiting effects of these symptoms are not entirely credible because those allegations are
28   greater than expected in light of the objective evidence of record."  Id.

One reason the ALJ discounted Plaintiff's credibility was that Plaintiff "described activities of daily living" that were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Id.  "In fact," the ALJ stated, "Plaintiff has admitted certain abilities that provide support for part of the [RFC] conclusion in this decision." Id.  The ALJ noted Plaintiff lived alone, and that in her August 6, 2010, Function Report, she stated she could water her yard, prepare simple meals, do the laundry, and shop in stores for groceries. Id.  The ALJ further noted Plaintiff handled her own finances, and that she "has been fully capable of advocating for herself throughout the entire appeals process without assistance of counsel," which suggested "a significant level of mental capacity for attention, concentration and focus that is in contrast with her allegations of disabling psychiatric symptoms." Id. "Furthermore," the ALJ wrote, "the claimant's ability to type the numerous lengthy statements that she has submitted to date is rather inconsistent with her allegations that she has significant difficulty with her upper extremities." Id. at 20-21.  The ALJ also noted Plaintiff was "capable of traveling to the East Coast to visit her children, an indication that she was not as socially limited or isolated as she has claimed." Id. at 21. The ALJ further noted the statements from Plaintiff's friends and family showed she was "capable of maintaining social relationships through Facebook and via telephone conversations." Id.  The ALJ also noted that, during Plaintiff's examination by Dr. Cross, Plaintiff stated she took care of self-dressing, self-bathing, and personal hygiene; drove her car; went to the gym; paid her bills; went out alone; had good relationships with family and friends; ran errands and went shopping; and used the computer. Id. (citation omitted).  The ALJ found all of this information "inconsistent with the severely limited level of function that the claimant endorsed at the hearing." Id.  The ALJ stated: "The physical and mental capabilities requisite to performing many of the activities above, as well as the social interactions described by the claimant, replicate those necessary for obtaining and maintaining employment." Id.

Another reason the ALJ discounted Plaintiff's claim of disability was that her

medical records revealed "routine, conservative, and non-emergency treatment since the alleged onset date." Id.  Relatedly, the ALJ noted the absence of "positive objective clinical and diagnostic findings" that "support functional limitations more restrictive than those" the ALJ assessed.  Id.  The ALJ extensively reviewed Plaintiff's medical history. See id. at 21-29.  The ALJ noted:

- In July of 2010, Plaintiff's blood pressure was considered "well controlled with oral medication."  Id. at 22 (citation omitted).

- Dr. Flanagan's physical examination of Plaintiff did not "suggest an ongoing etiology relating to the claimant's reported history of bilateral carpal tunnel and tarsal tunnel syndromes."  Id. (citation omitted).

- When examined by Dr. Sharobiem on August 31, 2011, Plaintiff "exhibited normal pulmonary functioning and cardiac findings"; "ambulated with a normal gait"; did not appear to have "joint swelling"; and "had normal muscle strength and tone."  Id. (citation omitted).

- Plaintiff did not report to Dr. Girgis that she used assistive devices or any pain medications.  Id. at 23.  Dr. Girgis also observed Plaintiff "was able to walk and move with ease."  Id. (citation omitted).

- Dr. Rai recommended "conservative pain management with NSAIDS."  Id.

- Dr. Bone recommended only "a brief course of psychotherapy or placement in a less stressful position at work to alleviate her symptoms of depression and anxiety."  Id. at 26.

- "[M]ental status examinations of the claimant generally revealed a fair ability for sustaining attention, concentration and memory."  Id. at 27. Relatedly, Dr. Cross's evaluation of Plaintiff showed minimal limitations in cognitive functioning that contrasted with Plaintiff's "subjective complaints of memory loss and cognitive impairments."  Id. at 28.

Another reason the ALJ discounted Plaintiff's credibility was that other doctors found her to be over-reporting her symptoms.  The ALJ noted Dr. Bone's "[c]linical

1  testing revealed objective signs of over-reporting and non-credible reporting of symptoms

2  by the claimant." <u>Id.</u> at 26 (citation omitted).  In addition, the ALJ noted Dr. Purisch

3  found Plaintiff to be "over-reporting" subjective symptoms.  <u>Id.</u> (citation omitted).

4

5       **2.      Relevant Law**

6       "In assessing the credibility of a claimant's testimony regarding subjective pain or

7  the intensity of symptoms, the ALJ engages in a two-step analysis."  <u>Molina</u>, 674 F.3d at

8  1112 (citation omitted).  "First, the ALJ must determine whether there is objective

9  medical evidence of an underlying impairment which could reasonably be expected to

10  produce the pain or other symptoms alleged."  <u>Id.</u> (citations and internal quotation marks

11  omitted).  "If the claimant has presented such evidence, and there is no evidence of

12  malingering, then the ALJ must give specific, clear, and convincing reasons in order to

13  reject the claimant's testimony about the severity of the symptoms."  <u>Id.</u> (citations and

14  internal quotation marks omitted).  "At the same time, the ALJ is not required to believe

15  every allegation of disabling pain, or else disability benefits would be available for the

16  asking . . . ."  <u>Id.</u> (citations and internal quotation marks omitted).

17       "In evaluating the claimant's testimony, the ALJ may use ordinary techniques of

18  credibility evaluation."  <u>Id.</u> (citations and internal quotation marks omitted).  "For

19  instance, the ALJ may consider inconsistencies either in the claimant's testimony or

20  between the testimony and the claimant's conduct; unexplained or inadequately explained

21  failure to seek treatment or to follow a prescribed course of treatment; and whether the

22  claimant engages in daily activities consistent with the alleged symptoms    . . . ."  <u>Id.</u>

23  (citations and internal quotation marks omitted).  "While a claimant need not vegetate in

24  a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's

25  testimony when the claimant reports participation in everyday activities indicating

26  capacities that are transferable to a work setting . . . ."  <u>Id.</u> (citations and internal

27  quotation marks omitted).  "Even where those activities suggest some difficulty

28  functioning, they may be grounds for discrediting the claimant's testimony to the extent

28

that they contradict claims of a totally debilitating impairment." Id. (citations and internal quotation marks omitted).

"When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ." Ghanim v. Colvin, 763 F.3d 1154, 1164 (9th Cir. 2014) (citation and internal quotation marks omitted). Even if "the ALJ erred in relying on one of several reasons in support of an adverse credibility determination," the error is considered harmless if "the ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (citation and emphasis omitted). "So long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal." Id. (citations, internal quotation marks, and alterations omitted); see also id. at 1163 ("Here, the ALJ's decision finding [the claimant] less than fully credible is valid, despite the [ALJ's] errors . . . .").

### 3.    Application

The ALJ provided "specific, clear, and convincing reasons" for finding Plaintiff not fully credible. Molina, 674 F.3d at 1112. First, the ALJ correctly noted Plaintiff's conduct – including not just her daily activities, but traveling cross-country and litigating this case herself – belied her claims of social isolation, inability to focus, and serious difficulty in the upper extremities. AR at 20-21; see also Molina, 674 F.3d at 1112 (stating a claimant's conduct is a permissible consideration in assessing the claimant's allegation of disability).

Second, the ALJ correctly noted Plaintiff's treatment regimen was conservative, consisting of oral and over-the-counter medications. AR at 21-22; see also Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) ("[T]he ALJ properly considered [claimant's doctor's] failure to prescribe, and [claimant's] failure to request, any serious medical

29

1  treatment for [claimant's] supposedly excruciating pain.") (citation omitted).

2      Third, the ALJ correctly noted the absence of objective clinical or diagnostic

3  findings to support Plaintiff's claim of disability.  AR at 21, 27.  While "an ALJ may not

4  reject a claimant's subjective complaints based *solely* on a lack of objective medical

5  evidence," the lack of such evidence remains a relevant consideration.  Burch v. Barnhart,

6  400 F.3d 676, 680 (9th Cir. 2005) (emphasis added; citation omitted).

7      Fourth, the ALJ correctly noted two examining physicians found Plaintiff to be

8  "non-credible" and to be "over-reporting" her symptoms.  AR at 26; see also Tonapetyan,

9  242 F.3d at 1148 (upholding ALJ's credibility determination, where ALJ noted

10 claimant's "tendency to exaggerate" her symptoms).

11     Assuming *arguendo* "the ALJ erred in relying on one of several reasons" in

12 making an adverse credibility finding, the "remaining reasoning and ultimate credibility

13 determination were adequately supported by substantial evidence in the record."

14 Carmickle, 533 F.3d at 1162.  Thus, the ALJ's decision was valid.  Id.

15

16 **F.    The ALJ Did Not Improperly Discount the Observations of Lay Witnesses.**

17 **(Claim Eight)**

18     Plaintiff argues "[t]hird-party observations were not properly weighed."  ECF No.

19 25 at 4.  Plaintiff argues the ALJ should not have discounted lay witnesses' observations

20 because, even though the witnesses "live in New Jersey or Arizona and don't see

21 [Plaintiff] daily," they "have a history with the plaintiff and [knew] the plaintiff before

22 and after the incidents disabled her."  Id. at 4-5.

23

24     **1.    Background**

25     Plaintiff submitted multiple letters from friends and family stating they observed

26 her having mood swings, depression, anxiety, shortness of breath, and other symptoms,

27 especially since her car accident in December 2009.  See AR at 412-20.  In addition,

28 Plaintiff's friend, Beatrice Braswell, testified at the hearing before the ALJ.  Id. at 69.

30

1    In assessing Plaintiff's RFC, the ALJ extensively considered these third-party
2    statements. Id. at 17-20.  The ALJ accorded only some, not significant, weight to
3    statements by Plaintiff's friend, Catherine Williams, because "she did not live with the
4    claimant at the time she [made the statements] and appeared to have relied on the
5    claimant's subjective complaints in describing her symptoms." Id. at 17.  The ALJ
6    accorded only some, not significant, weight to statements by Plaintiff's pastor, Michael
7    Pio, because "of the minimal contact Mr. Pio had with the claimant over the course of
8    only several months." Id. at 18.  The ALJ accorded only some, not significant, weight to
9    statements by Plaintiff's daughter, Regina Mahone, because she was "not living with the
10   claimant at the time she completed her written statement" and because, as a daughter, she
11   could not "be considered a disinterested third-party witness." Id.  The ALJ accorded only
12   some, not significant, weight to statements by Beatrice Braswell because she "was not
13   living with or interacting with the claimant on a daily or frequent basis at the time she
14   completed the statement or at the time of the hearing, a fact that diminishes the probative
15   value of her assertions regarding the claimant's daily functioning and her
16   symptomatology." Id. at 19.  The ALJ did not accord significant weight to the statements
17   by Plaintiff's friend, Yolanda Tarkington, because her "personal observations of the
18   claimant's behavior apparently were made over the phone or during . . . one day of
19   personal interaction." Id.

20        The ALJ also found the accuracy of the third-party statements "questionable"
21   because "the third-parties are likely not medically trained to make exacting observations
22   as to dates, frequencies, types and degrees of medical signs and symptoms, or of the
23   frequency or intensity of unusual moods or mannerisms." Id. at 20.  In addition, the ALJ
24   found the "clinical or diagnostic medical evidence" did not "support the level of severity
25   asserted in" the third-party statements. Id.

26

27        **2.    Relevant Law**

28        "An ALJ need only give germane reasons for discrediting the testimony of lay

31

witnesses." <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005) (citation omitted). While an ALJ need not discuss each piece of lay testimony "on a[n] individualized, witness-by-witness basis," the ALJ must at least explain the "reasons for disregarding the lay witness testimony . . . in the aggregate." <u>Molina</u>, 674 F.3d at 1115. "[A]n ALJ's failure to comment upon lay witness testimony is harmless where the same evidence that the ALJ referred to in discrediting the claimant's claims also discredits the lay witness's claims." <u>Id.</u> at 1122 (citation, internal quotation marks, and alterations omitted).

### 3.    Application

The ALJ gave permissible, germane reasons for discounting the third-party statements. The ALJ diligently addressed the credibility of each lay witness on an individualized basis. The ALJ permissibly noted none of the lay witnesses observed Plaintiff on a daily, long-term basis. <u>See</u> <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1999) (noting that lay witnesses who view a claimant "on a daily basis" are more valuable). The ALJ also permissibly noted at least some of the lay witnesses were not disinterested parties. <u>See</u> <u>Greger v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006) (holding that an ALJ permissibly discounted a lay witness's statements because she had a "close relationship" with the claimant and "was possibly influenced by her desire to help" him). Finally, the ALJ permissibly noted the third-party statements were generally "[i]nconsisten[t] with medical evidence" in the record. <u>Bayliss</u>, 427 F.3d at 1218 (citation omitted). Thus, the ALJ did not err in discounting the third-party statements.

**G.** **The ALJ Did Not Err in Finding Plaintiff's Fibromyalgia Non-Severe. (Claim Three)**

Plaintiff argues her fibromyalgia was "erroneously classified as 'non-severe.'" ECF No. 25 at 4.

**1.** **Background**

The ALJ noted Plaintiff "made complaints of 'whole body pain' and fibromyalgia." AR at 13. However, the ALJ found Plaintiff did not satisfy the Agency's criteria for diagnosing fibromyalgia. Id. at 14. The ALJ rejected Dr. Sharobiem's diagnosis of fibromyalgia, finding the diagnosis was inconsistent "with the other evidence in the claimant's case record, including the claimant's level of daily activities, her course of treatment and the objective physical findings in the treatment records." Id.

**2.** **Discussion**

Pursuant to Social Security Ruling 12-2p, fibromyalgia is considered a medically determinable impairment if (1) there is a history of widespread pain; (2) there have been repeated manifestations of six or more fibromyalgia symptoms (*e.g.*, fatigue, depression, anxiety, memory problems) *or* a physical examination shows "[a]t least 11 positive tender points"; and (3) there is evidence that other disorders did not cause the symptoms. SSR 12-2p. An ALJ may not "rely upon [a] physician's diagnosis [of fibromyalgia] alone." Id.

The ALJ properly rejected Dr. Sharobiem's diagnosis of fibromyalgia. Nothing in the record indicates Dr. Sharobiem made "specific findings to support that diagnosis, such as a history of widespread pain, pain on palpation of at least 11 of 18 tender points, or the exclusion of other disorders that could have caused Plaintiff's symptoms." Martinez v. Astrue, Case No. 2:11-10082-JPR, 2012 WL 6093509, at *10 (C.D. Cal. 2012) (citation omitted). Thus, Dr. Sharobiem's diagnosis was "not well supported." Id. (citing SSR 12-2p for the principle that the claimant must "display[] specific diagnostic

33

criteria"); see also Rodriguez v. Colvin, Case No. 5:12-416-RNB, 2013 WL 1401224, at *2 (C.D. Cal. 2013) (ALJ permissibly rejected treating physician's diagnosis of fibromyalgia, where "no other treating or examining physician diagnosed fibromyalgia" and there were no "treatment records showing regular and consistent clinical findings of fibromyalgia"); Anderson v. Comm'r of Soc. Sec. Admin., Case No. 8:11-1820-AJW, 2013 WL 440703, at *6 (C.D. Cal. 2013) (ALJ permissibly rejected treating physician's diagnosis of fibromyalgia, where physician "omitted the generally accepted diagnostic findings from his evaluation").

The other evidence in the record that the ALJ considered in finding Plaintiff did not suffer from fibromyalgia – i.e., her daily activities, course of treatment, and objective physical findings – was also valid.  See supra Section VII.E; SSR 12-2p (stating fibromyalgia can be considered a medically determinable impairment only if the diagnosis "is not inconsistent with the other evidence in the person's case record"); see also Walker v. Barnhart, 148 F. App'x 632, 633-34 (9th Cir. 2005).

## H.     The ALJ Adequately Considered Plaintiff's Medication Regimen.  (Claim Eight)

Plaintiff argues the ALJ improperly failed to consider the "type, dosage, effectiveness, and side effects" of all of Plaintiff's medications, as required by "Social Security regulations."  ECF No. 25 at 4.

"The type, dosage, effectiveness, and side effects of medication taken by a claimant to treat pain or other symptoms are factors relevant to a disability determination and should be considered by the ALJ."  Short v. Astrue, 648 F. Supp. 2d 1185, 1191 (C.D. Cal. 2009) (citing 20 C.F.R. § 404.1529(c)(3)(iv)).  In reviewing the medical evidence, the ALJ extensively considered Plaintiff's medication regimen.  For example, the ALJ noted Plaintiff "did not indicate that she was taking prescription pain medications."  AR at 16; see also id. at 28 ("[Plaintiff] is not taking narcotic pain medications for the alleged chronic pain symptoms.").  The ALJ also noted Plaintiff

recently stated her dosage of depression and anxiety medications had been increased.  Id. at 16-17.  The ALJ also noted Plaintiff's "blood pressure was noted to be well controlled with oral medication."  Id. at 21-22 (citation omitted).  The ALJ further noted Plaintiff "was afraid of taking pain medications due to reaction with Celebrex and other anti-inflammatory medications."  Id. at 23.  The ALJ also noted Dr. Rai advised Plaintiff "to continue conservative pain management with NSAIDs and [other] pain medications on an as needed basis."  Id. at 24.  In addition, the ALJ noted Plaintiff's medications as of April 2013 – including "Zoloft, Xanax, Norvasc, Nasonex, prednisone, and Cymbalta."  Id. at 27.  Thus, the ALJ closely analyzed Plaintiff's medication regimen.

While the ALJ did not explicitly analyze the side effects of Plaintiff's medications, Plaintiff never alleged their side effects were disabling.  See Short, 648 F. Supp. 2d at 1191 (noting the claimant "bears the burden of proving that a medication's side effects are disabling") (citations omitted); Tarver v. Astrue, Case No. 5:8-1416-MLG, 2009 WL 2711888, at *4 (C.D. Cal. 2009) ("If Plaintiff's medications prevent her from working, she has to say so.  Only at that point does the type, dosage, effectiveness, and side effects of medication become relevant, so the ALJ can evaluate Plaintiff's credibility."); Olley v. Astrue, Case No. 5:8-18-MLG, 2008 WL 4554883, at *7 (C.D. Cal. 2008).  Even if Plaintiff *had* alleged disabling side effects, the ALJ properly found Plaintiff's allegations of disability were not credible and not supported by objective evidence.  See supra Section VII.E; see also Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002) (upholding ALJ's rejection of claimant's statements that her medications affected her concentration and made her dizzy, where the claimant offered "no objective evidence" of those side effects and the ALJ "properly" found the claimant's testimony "generally not credible").

Finally, the Court notes the ALJ stated she considered all of the medical evidence in the Administrative Record, "regardless of whether it is specifically cited in th[is] decision."  AR at 21.  For the foregoing reasons, the ALJ properly considered Plaintiff's medication regimen.  In the alternative, assuming the ALJ erred, the error was

1  "inconsequential to the ultimate nondisability determination."  <u>Robbins</u>, 466 F.3d at 885.

2

3  **I.    The ALJ's RFC Assessment Was Sufficient.  (Claims Two and Four)**

4       Plaintiff appears to argue the ALJ failed to "consider both severe and non-severe

5  impairments" in assessing her RFC.  ECF No. 25 at 4.  Relatedly, Plaintiff argues the

6  VE's "testimony [was] not based on correct RFC."  <u>Id.</u>

7

8       **1.    Relevant Law**

9       In determining a claimant's RFC, an ALJ must consider all relevant evidence in the

10  record.  <u>Robbins</u>, 466 F.3d at 883.  "The ALJ is required to consider all of the limitations

11  imposed by the claimant's impairments, even those that are not severe."  <u>Carmickle</u>, 533

12  F.3d at 1164 (citation omitted).  "Even though a non-severe impairment[] standing alone

13  may not significantly limit an individual's ability to do basic work activities, it may –

14  when considered with limitations or restrictions due to other impairments – be critical to

15  the outcome of a claim."  <u>Id.</u> (citation and internal quotation marks omitted).  "[A]n RFC

16  that fails to take into account a claimant's limitations is defective."  <u>Valentine v. Comm'r</u>

17  <u>Soc. Sec. Admin.</u>, 574 F.3d 685, 690 (9th Cir. 2009).

18       "The hypothetical an ALJ poses to a vocational expert, which derives from the

19  RFC, must set out *all* the limitations and restrictions of the particular claimant."  <u>Id.</u>

20  (citation and internal quotation marks omitted; emphasis in original); <u>see also</u> <u>Bayliss</u>,

21  427 F.3d at 1217 (holding that an ALJ may rely on the testimony of a VE if the VE

22  considered "all of the [claimant's] limitations that the ALJ found credible and supported

23  by substantial evidence in the record").

24

25       **2.    Application**

26       Plaintiff does not specify which non-severe impairments the ALJ failed to consider

27  in assessing her RFC.  Nevertheless, the Court has reviewed the ALJ's RFC assessment.

28  The Court finds the RFC assessment took into account all of Plaintiff's limitations, both

36

1   severe and non-severe, and was supported by substantial evidence.  See Valentine, 574

2   F.3d at 690.  The VE relied on the RFC assessment in determining that Plaintiff could

3   perform her past relevant work.  See AR at 29.  Thus, the Court upholds the RFC

4   assessment, the VE's determination based on that assessment, and the ALJ's reliance on

5   the VE's determination at step four.

6

7                                             **VIII.**

8                                        **CONCLUSION**

9           IT IS THEREFORE ORDERED that judgment be entered AFFIRMING the

10   decision of the Commissioner.

11

12

13   DATED:  March 31, 2015                    _____

14                                             HON. KENLY KIYA KATO
                                               United States Magistrate Judge

37